No. 25–20379

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DONALD W. HUTCHINGS,

*Plaintiff–Appellant*,

vs.

DIRECT DIGITAL HOLDINGS, INC.; MARK D. WALKER; KEITH W. SMITH; DIANA P. DIAZ; DIRECT DIGITAL MANAGEMENT, L.L.C.,

*Defendants–Appellees*.

_____

On Appeal from an Order of the United States District Court
for the Southern District of Texas in No. 4:24–cv–01940
Kenneth M. Hoyt, U.S. District Judge

## APPELLANT'S OPENING BRIEF

JOHNSON FISTEL, PLLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone: 470.632.6000
michaelf@johnsonfistel.com

SPONSEL MILLER PLLC
THANE TYLER SPONSEL III
520 Post Oak Boulevard, Ste. 310
Houston, TX  77027
Telephone: 713.892.5400
sponsel@smglawgroup.com

JOHNSON FISTEL, PLLP
JEFFREY A. BERENS
2373 Central Park Boulevard, Ste. 100
Denver, CO  80238
Telephone: 303.861.1764
jeffb@johnsonfistel.com

*Counsel for Plaintiff–Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. All persons who purchased or otherwise acquired Direct Digital Holdings, Inc. Class A common stock during the period from November 10, 2023 through October 15, 2024, inclusive, including lead plaintiff Donald W. Hutchings, individually and as trustee of the Brady Adam Hutchings Irrevocable Trust U/A DTD 12/18/2012, the Donald W. Hutchings Living Trust U/A DTD 09/19/1994, the Donald W. Hutchings Principal Residence Trust U/A DTD 09/19/1994, the Hutchings Community Property Trust U/A DTD 05/20/2015, the Jay Whitney Hutchings Irrevocable Trust, Grantors Donald W. Hutchings and Pamela Paul Hutchings, dated December 18, 2012, and the Pamela Paul Hutchings Principal Residence Trust U/A DTD 09/19/1994;

2. Defendant Direct Digital Holdings, Inc.;

3. Defendant Mark D. Walker;

4. Defendant Keith W. Smith;

5. Defendant Diana P. Diaz;

i

6.    Defendant Direct Digital Management, LLC;

7.    Johnson Fistel, PLLP, counsel for Plaintiff;

8.    Sponsel Miller PLLC, counsel for Plaintiff;

9.    Baker Botts L.L.P., counsel for Defendants.

*s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.
*Counsel for Plaintiff-Appellant*

ii

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff hereby requests oral argument.  Plaintiff believes oral argument will assist this Court in its analysis of the issues presented on appeal, including whether Plaintiff sufficiently alleges any actionable false or misleading statements of current fact, "half–truth" statements, and/or statements of opinion.

# **TABLE OF CONTENTS**

**Page No.**

CERTIFICATE OF INTERESTED PERSONS ...................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS..........................................................................iv

TABLE OF AUTHORITIES ...................................................................... vii

JURISDICTION.....................................................................................1

STATEMENT OF THE ISSUES..................................................................1

STATEMENT OF THE CASE.....................................................................2

    A.    Procedural History...............................................................2

    B.    Case Summary....................................................................2

    C.    Statement of Facts ...............................................................4

        1.    Description of the Parties.........................................4

        2.    Direct Digital's Business Was Focused on Its Colossus Subsidiary; Google Was Responsible for 94% of Colossus's Revenues and All of Its Growth.....................................5

        3.    Direct Digital Recognizes Its Revenue in Real–Time and Pays Publishers in Advance for Ad Inventory ...................................6

        4.    Direct Digital Surprised Investors with Stellar Q3 2023 Results Driven by a Doubling of Google Revenues; The Company Raised FY 2023 Guidance by 50%.............................................7

        5.    Behind the Scenes, Direct Digital Suffered Critical Platform Failures That Caused Colossus SSP to Misdeclare User IDs and Led The Trade Desk—Its Second Largest Customer—to Partially Block the Platform Across Its Network .......................8

6. Google Discovered Colossus SSP's Misdeclaration Defect, Suspended the Platform, Issued Credits to Its Affected Advertisers, and Short Paid Direct Digital by More Than $8.8 Million ..................................................................................9

7. Walker Continued to Tout Direct Digital's FY 2023 Guidance—Without Qualification—Even After the Google Suspension and Its Refusal to Pay More Than $8.8 Million ................................9

8. Defendants Blamed Direct Digital's $12.9 Million FY 2023 Revenue Shortfall on Minor Q4 Factors While Concealing the Real Cause—Google's Suspension and Short Pay ...................10

9. Direct Digital's Independent Auditor Resigned Rather Than Sign Off on Its FY 2023 SEC Form 10–K .......................................11

10. Adalytics Research Exposed Colossus SSP's Misdeclaration Problem Which Direct Digital Itself Later Confirmed .............11

11. Direct Digital Belatedly Filed Its FY 2023 Form 10–K and Q1 & Q2 2024 Form 10–Qs and for the First Time Disclosed That the Google Short Pay Caused Most of the FY 2023 Shortfall ........13

SUMMARY OF ARGUMENT ...........................................................................14

STANDARD OF REVIEW ................................................................................17

ARGUMENT .....................................................................................................18

I. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S PRIMARY LIABILITY CLAIMS ........................................................18

A. The District Court Erred in Finding That Defendants' March 26, 2024 Statements of Current Fact Regarding the Two Primary Reasons for Direct Digital's FY 2023 Revenue Shortfall and Current Positioning for Future Growth Were Not Actionable ....................18

B. The District Court Erred in Finding That Walker's February 1, 2024 "Half–Truth" Opinion That Raising Direct Digital's FY 2023 Guidance Was a "Significant Milestone" Was Not Actionable ....24

C.      The District Court Erred in Finding That Defendants' May 10, 2024 False and Misleading Statements of Current Fact Concerning the Company's Q1 2024 Performance Were Not Actionable .............27

D.      The District Court Erred in Holding That Defendants' Growth and Financial Guidance–Related Statements Were Not Actionable ....28

        1.      Defendants' November 9, 2023 Statements Concerning Direct Digital's Increase of FY 2023 Guidance Were Materially Misleading Absent Disclosure of the Grave Risk That Google Would Discover Colossus SSP's Systematic Misdeclaration of User IDs.................................................28

        2.      Defendants' December 5, 2023 and January 9, 2024 Voluntary Reaffirmations of FY 2023 Guidance Were Materially Misleading Because They Omitted That the Misdeclaration Risk Had Materialized and Google Had Suspended Its Business........................................................31

II.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S CONTROL PERSON CLAIMS...............................................................35

III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S REQUEST FOR A SUR–REPLY ..................................35

CONCLUSION ......................................................................................................37

# TABLE OF AUTHORITIES

**Page No.**

**CASES**

*Colossus Media, LLC v. Adalytics Research, LLC*,
  No. DKC 24–1402,
  2025 WL 712986 (D. Md. Mar. 5, 2025) ....................................................... 35

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
  99 F.4th 770 (5th Cir. 2024) ...................................................................37

*Hutchins v. NBTY, Inc.*,
  No. CV 10–2159(LDW)(WDW),
  2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012).......................................................33

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ....................................................... 26, 31

*In re BP p.l.c. Sec. Litig.*,
  No. 4:10–MD–2185,
  2016 WL 3090779 (S.D. Tex. May 31, 2016).......................................................25

*Junius Constr. Co. v. Cohen*,
  178 N.E. 672 (N.Y. Ct. App. 1931)......................................................................21

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ........................................................ *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)................................................. 15, 18, 21, 32, 35

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ...........................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................... 17, 30, 31, 34

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...........................................................................17

*Oklahoma Firefighters Pen. & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) .......................................................... 4, 16, 28, 33, 35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pen. Fund*,
  575 U.S. 175 (2015)................................................................................. *passim*

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ..........................................................................23

*Residents of Gordon Plaza, Inc. v. Cantrell*,
  25 F.4th 288 (5th Cir. 2022) .................................................................. 17, 18, 35

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
  No. 23 Civ. 2138 (JPC),
  2024 WL 4354809 (S.D.N.Y. Sept. 30, 2024) ................................................ 30, 31

*Rougier v. Applied Optoelectronics, Inc.*,
  No. 4:17–CV–2399,
  2019 WL 6111516  (S.D. Tex. Mar. 27, 2019) ....................................... 20, 23, 33

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) ............................................................................34

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020)................................................................25

**STATUTES, RULES AND OTHER AUTHORITIES**

15 U.S.C. §78aa .............................................................................................1

15 U.S.C. §78j(b) ...........................................................................................1

15 U.S.C. §78t(a) ...........................................................................................1

15 U.S.C. §78u–4(a)(3)(B)(iii) ........................................................................2

17 C.F.R. §240.10b–5 .....................................................................................1

17 C.F.R. §240.10b–5(b) ...............................................................................18

28 U.S.C. §1291 ............................................................................................1

28 U.S.C. §1331 ............................................................................................1

Securities Exchange Act of 1934 §10(b) ............................................... 1, 18, 21, 35

Securities Exchange Act of 1934 §20(a) ................................................ 1, 2, 17, 35

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and 15 U.S.C. §78aa, as this case presents claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Securities and Exchange Commission ("SEC") Rule 10b–5 (17 C.F.R. §240.10b–5).

In an order dated and entered August 7, 2025, the district court dismissed the Consolidated Complaint for Violation of Federal Securities Laws and Jury Demand ("Complaint") and denied Plaintiff an opportunity to amend, thereby terminating the litigation as to all claims and parties. ROA.2024–2042. Plaintiff filed a timely notice of appeal on September 3, 2025. ROA.2043–2045. This Court has jurisdiction under 28 U.S.C. §1291 to review the district court's order of dismissal.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by failing to separately analyze the distinct categories of alleged misstatements—*e.g.*, statements of current fact, half–truths, and statements of opinion—and instead dismissed all claims in a single, largely undifferentiated ruling.

2.      Whether, in doing so, the district court erroneously concluded that Plaintiff failed to allege any actionable false or misleading statements, including false or misleading statements of present fact, misleading half–truths, and/or misleading opinions.

3.      Whether the district court erred in dismissing Plaintiff's §20(a) control person claims.

4.      Whether the district court abused its discretion in denying Plaintiff's request to file a sur–reply addressing new matters raised in Defendants' reply brief.

STATEMENT OF THE CASE

### A.      Procedural History

The district court consolidated two related actions brought on behalf of Direct Digital shareholders and appointed Donald W. Hutchings ("Plaintiff"), individually and on behalf of several trusts, as lead plaintiff pursuant to 15 U.S.C. §78u–4(a)(3)(B)(iii) on August 27, 2024.  ROA.428–429.  Plaintiff filed the operative Complaint on November 13, 2024.  ROA.438–500.  After Defendants moved to dismiss, on August 7, 2025, the Honorable Kenneth M. Hoyt, U.S. District Judge for the Southern District of Texas, dismissed the Complaint, denied Plaintiff's request for an opportunity to amend, and terminated the action.  ROA.2024–2042.  Plaintiff timely filed his notice of appeal on September 3, 2025.  ROA.2043–2045.

### B.      Case Summary

This case arises from the misconduct of Direct Digital Holdings, Inc. (NASDAQ: DRCT) ("Direct Digital" or the "Company") and its majority owners, who were also its most senior executives.  ROA.442(¶2).  Direct Digital operates a programmatic advertising business through its primary subsidiary, Colossus Media,

LLC ("Colossus"), which runs a proprietary sell side platform connecting publishers with digital ad buyers.  ROA.442(¶3).  After reporting unexpected success in Q3 2023[1], Defendants continued to promote the Company's positioning for growth and optimistic outlook while concealing a grave, unresolved platform defect that imperiled the Company's entire sell side business.  ROA.443–444(¶¶6–9).  This platform flaw caused advertisers to pay for ads that never reached their intended audiences—the very service the Company was paid a premium to deliver.  ROA.445(¶10).

As the problem persisted, Direct Digital's two largest customers, The Trade Desk and Google Display & Video 360 ("Google"), which was responsible for more than 82% of the Company's total revenue, responded decisively.  ROA.461(¶60); ROA.466(¶75).  In mid–2023, The Trade Desk implemented a continuing partial blockage of Colossus SSP across its network, allowing access only when specifically requested by an advertiser.  ROA.445(¶11).  Google took similar action in late Q4 2023, suspending its relationship with the Company and sharply reducing its business thereafter.  *Id.*; ROA.446(¶15).

Rather than disclose the platform crisis, The Trade Desk's partial blockage, Google's subsequent suspension, or otherwise temper their outlook, Defendants

---

[1] "Q# 202#" references the Company's quarter (or fiscal year, "FY") and year, that is, Q3 2023 is third quarter of 2023.  The action is brought on behalf of a putative class consisting of all persons who purchased or otherwise acquired Direct Digital Class A common stock during the period from November 10, 2023 through October 15, 2024, inclusive (the "Class Period").  ROA.442(¶1).

engaged in a "reckless[] gamble" that this undisclosed "bad news" would be eclipsed by future "good news." *See Oklahoma Firefighters Pen. & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 215 (5th Cir. 2023). When continued concealment was no longer possible, Defendants falsely attributed the Company's poor financial performance to two temporary issues confined to Q4 2023, further misleading investors. ROA.446–447(¶16).

Only after an advertising transparency firm report and follow up reporting exposed the platform defect, the ongoing The Trade Desk blockage, and Google's suspension and pullback of business—and after Direct Digital filed its overdue FY 2023 financials nearly seven months later—did investors learn the truth. ROA.447–448(¶17); ROA.448–449(¶21). But by then it was too late. The Company admitted that its largest customers had already curtailed their business and as a result there was "substantial doubt" about its "ability to continue as a going concern." ROA.448–449(¶21).

### C.    Statement of Facts

#### 1.    Description of the Parties

Plaintiff is a retired property management company president and a former Chief Financial Officer ("CFO"), with nearly 35 years of investing experience. ROA.224(¶1). During the Class Period, Plaintiff purchased more than 32,000 shares

of Direct Digital common stock and incurred losses exceeding $500,000 because of Defendants' alleged violations of the federal securities laws.  ROA.201.

Direct Digital is an end–to–end, full–service programmatic advertising platform for both buy and sell side digital advertising.  ROA.442(¶2).  The Company is controlled by its co–founders, Chief Executive Officer and Chairman, Mark D. Walker ("Walker"), and President, Keith W. Smith ("Smith"), who together own all of its Class B common stock (exchangeable for publicly traded Class A shares) and who retain 77% voting power over its operations.  ROA.450–453(¶¶28–30, 32).  Direct Digital Management, LLC ("DDM") is the entity through which Walker and Smith hold their Direct Digital Class B stock.  ROA.452–453(¶32).  According to the Company's 2023 SEC Form 10–K, "[Direct Digital] is controlled by DDM, whose interests may differ from those of our public stockholders."  ROA.452–453(¶32).  Diana P. Diaz ("Diaz") is the Company's CFO.  ROA.452(¶31).[2]

### 2.    Direct Digital's Business Was Focused on Its Colossus Subsidiary; Google Was Responsible for 94% of Colossus's Revenues and All of Its Growth

Direct Digital's primary subsidiary, accounting for 78% of FY 2023 revenues ($122.4 million) and all its growth, was Colossus, which operated its proprietary sell side programmatic platform, Colossus SSP™ ("Colossus SSP").  ROA.442(¶3);

---

[2] The district court's dismissal order mistakenly lists Susan Echard as a defendant.  ROA.2024.  Ms. Echard was a defendant in the initial (now consolidated) complaints filed by other plaintiffs and their counsel.  *See, e.g.*,  ROA.420.  She is not named as a defendant in Plaintiff's Complaint.  ROA.450–453(¶¶28–32).

ROA.460–461(¶58). Colossus SSP allowed publishers to sell ad impressions to buyers, through either real–time bidding auctions or direct deals with demand side platforms ("DSPs") or other ad networks. ROA.457–458(¶¶47–49). Colossus SSP depended heavily on "cookies" or other user IDs to its deliver targeted ads. ROA.443(¶4); ROA.453–454(¶¶36–37). It processed billions of ad impressions, each occurring automatically in an auction/bidding format, in a fraction of a second. ROA.458(¶49).

Colossus's business was highly concentrated. ROA.461(¶59). In Q3 2023, 94% of its revenues (82% of total Direct Digital revenues) and most of its quarter over quarter growth came from a single DSP customer, Google. ROA.461(¶60); ROA.466(¶75). Colossus's second largest customer was another large DSP, The Trade Desk. ROA.459(¶53); ROA.466(¶75). Google and The Trade Desk are two of the largest, most prominent, and sophisticated DSPs in world. ROA.459(¶53).

### 3. Direct Digital Recognizes Its Revenue in Real–Time and Pays Publishers in Advance for Ad Inventory

Direct Digital's revenue is recognized in real–time, that is, immediately "when an ad is delivered or displayed in response to a winning bid request." ROA.458(¶50). These ad impressions are bought and served before any payment is made by the advertiser. *Id.* Direct Digital pays publishers for its ad buys in advance, purchasing "inventory." *Id.* The Company typically is paid later by the DSP/customer that sold the ad inventory after the DSP/customer is paid by the

advertiser. *Id.* However, unlike most other SSPs, under the Company's contracts with publishers the publisher retains Direct Digital's ad payments whether or not the Company is paid by the DSP. *Id.*

### 4. Direct Digital Surprised Investors with Stellar Q3 2023 Results Driven by a Doubling of Google Revenues; The Company Raised FY 2023 Guidance by 50%

Throughout most of its history, Direct Digital's stock price languished. ROA.443(¶5). But on November 9, 2023, the Company surprised investors by reporting Q3 2023 revenues of $59.5 million and adjusted EBITDA of $5.4 million, blowing away Wall Street's expectations. ROA.462–463(¶64). With Q4 2023 almost halfway complete, the Company further announced that it was raising its FY 2023 revenue guidance by 50%, to between $170 million and $190 million, citing its strong operating leverage, customer relationships, and the "platform that we've been able to establish."[3] ROA.463(¶65); ROA.474(¶95); ROA.475–476(¶¶99–100).

In response, Direct Digital's stock price promptly doubled to $5.34 per share. ROA.463(¶66). Defendants would reaffirm their FY 2023 revenue and growth outlook throughout the remainder of FY 2023 and well into Q1 2024, driving the Company's stock price to $32.51 per share on March 15, 2024. ROA.444(¶8); ROA.463(¶¶65–66).

---

[3] Emphasis added to quotations within the Complaint is not necessarily reproduced in this brief.

7

**5.      Behind the Scenes, Direct Digital Suffered Critical Platform Failures That Caused Colossus SSP to Misdeclare User IDs and Led The Trade Desk—Its Second Largest Customer—to Partially Block the Platform Across Its Network**

Despite the impressive Q3 2023 results, behind the scenes Direct Digital was grappling with a crisis involving Colossus SSP. The Company's second largest customer, The Trade Desk, had in mid–2023 observed Colossus presenting misdeclared user IDs when working with its platform. ROA.463–464(¶¶67–68). This serious platform defect caused advertisers working with The Trade Desk to pay for ads that never reached their intended audiences, the core service for which the Company charged a premium. ROA.445(¶10); ROA.464(¶68) (The Trade Desk suspension came after "it saw aberrations in results for high–value targets, and put the puzzle pieces together"). In response, The Trade Desk instituted an ongoing partial blockage of Colossus across its network, permitting access only when an advertiser specifically requested the SSP. ROA.464(¶68).

With Google accounting for 94% of Colossus's Q3 2023 revenues (and 82% of total Company revenues), The Trade Desk's partial blockage was financially manageable. ROA.461(¶60). But it portended a far greater threat—one that had the potential to upend Direct Digital's business entirely. The Company's inability to correct the problem and that its largest customer, Google, was among the most sophisticated and influential DSPs in the world, meant that when Google inevitably detected the issue, the financial ramifications would be far–reaching and devastating.

8

ROA.459(¶53); ROA.464–465(¶¶68–69); ROA.466(¶73). Yet, Defendants chose to promote Direct Digital's positioning for growth and financial outlook, without qualification, while keeping this very real catastrophic risk from investors. ROA.474(¶96).

> **6.      Google Discovered Colossus SSP's Misdeclaration Defect, Suspended the Platform, Issued Credits to Its Affected Advertisers, and Short Paid Direct Digital by More Than $8.8 Million**

It did not take long for this risk to materialize. In late 2023, Google discovered that Colossus SSP was misdeclaring user IDs and blocked the Company across its network. ROA.465–466(¶¶71–75). After issuing credits to its affected advertisers, Google ultimately reinstated Colossus SSP but, like The Trade Desk, at a fraction of previous volumes. ROA.465(¶71); ROA.461(¶60). In January 2024, Google formally notified Direct Digital that it was "short paying" a Q4 2023 invoice in an amount exceeding $8.8 million, such that the Company did not receive and could not recognize that revenue in its FY 2023 financials. ROA.470–471(¶87); ROA.466(¶75).

> **7.      Walker Continued to Tout Direct Digital's FY 2023 Guidance—Without Qualification—Even After the Google Suspension and Its Refusal to Pay More Than $8.8 Million**

After Google's Q4 2023 suspension, Walker could have opted to remain silent on December 5, 2023 and January 9, 2024. ROA.477–478(¶103); ROA.479(¶106). Likewise, on February 1, 2024, after Google informed the Company that it would

9

not pay more than $8.8 million from a Q4 2023 invoice, he could have refrained from publicly discussing Direct Digital's guidance for the already completed but unannounced FY 2023, or at least he could have chosen to qualify his remarks so as not to mislead.  ROA.479–480(¶108).  Instead, Walker continued to promote Direct Digital's purported positioning for future growth and reaffirmed FY 2023 revenue guidance of $170 to $190 million, without qualification.  ROA.477–478(¶103); ROA.479(¶106); ROA.479–480(¶108).

### 8. Defendants Blamed Direct Digital's $12.9 Million FY 2023 Revenue Shortfall on Minor Q4 Factors While Concealing the Real Cause—Google's Suspension and Short Pay

On March 26, 2024, Direct Digital announced its FY 2023 financial results reporting just $157.1 million in revenues and badly missing its revised guidance.  ROA.481(¶111).  On this news, Direct Digital's stock price plummeted nearly 40%, from $26.51 per share on March 26, 2024, to $16.04 per share the next day.  ROA.446–447(¶16).

While disappointing, Defendants assured investors that the Company remained in a position to "continue our strong revenue growth" because the miss was due to "two primary factors" that were largely confined to Q4 2023, that is: (1) soft demand and (2) its proactive, accelerated transition towards a cookie–less platform.　　ROA.481(¶111);　　ROA.482(¶113);　　ROA.482–483(¶¶114–115). Defendants failed to disclose Google's Q4 2023 suspension and $8.8 million short

10

pay, or that they together accounted for the large majority (if not all) of the $12.9 million revenue shortfall.  ROA.483–484(¶117).  They also continued to hide the ongoing crisis with Colossus's platform which they still could not fix, and which had already caused the Company's two largest customers to significantly reduce their business.  ROA.466(¶73); ROA.483–484(¶117).

### 9.    Direct Digital's Independent Auditor Resigned Rather Than Sign Off on Its FY 2023 SEC Form 10–K

Although the Company disclosed its Q4 & FY 2023 revenues on March 26, 2024, it did not then file its detailed 2023 SEC Form 10–K because its independent auditor, Marcum LLP, chose to quit rather than sign off on its FY 2023 financials. ROA.469(¶84).  Marcum's April 17, 2024 resignation was reportedly because of its inability to verify Direct Digital's impressions data and concerns about its reports for publishers.  ROA.486(¶123).  As it turned out, Direct Digital's Form 10–K would not be filed for nearly seven months, allowing Defendants to continue to conceal Google's suspension and short pay from investors.  ROA.470–471(¶87).

### 10.    Adalytics Research Exposed Colossus SSP's Misdeclaration Problem Which Direct Digital Itself Later Confirmed

On May 10, 2024, Adalytics Research, LLC ("Adalytics") published a detailed study of The Trade Desk and sixteen SSPs, comparing each SSP's declared user IDs (upon which advertisers bid) to the actual user IDs.  ROA.463–464(¶67). Over several months of observation, Adalytics found that *only* Colossus SSP

11

exhibited a mismatch, declaring a different user ID to The Trade Desk than the actual user ID stored in the user's browser. *Id.* Other publications soon reported additional details including the first public reports of The Trade Desk blocking Colossus SSP in mid–2023 and Google's confirmation of its suspension of the platform in late 2023. ROA.464–466(¶¶68–73). The articles also reported that at least three publishers had confirmed Colossus SSP's misdeclaration of user IDs (ROA.464–465(¶69)), further corroborating reports that Colossus was unable to fix the issue (ROA.466(¶73)) and demonstrating that it was an ongoing issue across the Company's entire sell side platform. ROA.445(¶¶10–11); ROA.469(¶83). After the Company initially denied that it had been cut off by Google, Direct Digital's Vice President of Technology confirmed that the Google suspension had in fact happened, that it was because of the user ID mismatch issue, and that Direct Digital did not know how to fix it. ROA.466(¶73).[4]

Thus, by late May 2024, the façade was beginning to crumble, and the truth was starting to emerge. As one industry commentator explained at the time:

> *These actions by The Trade Desk and Google paint a much clearer picture of why Direct Digital Holdings faced such significant financial pressure in Q4 2023. It wasn't just about transitioning to a cookie–less future; it was about the immediate and tangible impacts of losing trust and access within the industry.*

---

[4] Colossus later sued Adalytics for suggesting that its systemic misdeclaration of user IDs was the result of intentional click fraud. ROA.2005–2006. The Complaint here alleges that the misdeclaration issue was "not necessarily the result of intentional misconduct by or on behalf of Direct Digital." ROA.445(¶11).

*When two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full–blown crisis. This context makes the company's earlier explanations seem like a smokescreen, diverting attention from the real issues at hand.*

*So, while Direct Digital Holdings tried to spin a tale of proactive adaptation to industry changes, the reality was far grimmer. The loss of trading privileges with major partners like The Trade Desk and Google likely had a direct impact on their bottom line. These events make a far more plausible explanation for their Q4 financial woes than the narrative they attempted to sell.*

ROA.441; ROA.470(¶86).

> **11.** **Direct Digital Belatedly Filed Its FY 2023 Form 10–K and Q1 & Q2 2024 Form 10–Qs and for the First Time Disclosed That the Google Short Pay Caused Most of the FY 2023 Shortfall**

On October 15, 2024, Direct Digital belatedly filed its 2023 Form 10–K. ROA.470–471(¶87). The Company disclosed for the first time that its largest sell side customer (Google) had short paid a Q4 2023 invoice, resulting in an $8.8 million expense and lower associated revenue in FY 2023. *Id.* It further disclosed that because of its platform problem a "significant customer" (which was The Trade Desk) had "paused its connection" then resumed its business at even lower volumes. ROA.471–472(¶88); ROA.472(¶91); ROA.489–490(¶133). As a result, there was substantial doubt about its ability to continue as a going concern. ROA.471–472(¶88).

Defendants implausibly professed ignorance of the connection between Google's short pay and its misdeclaration–related suspension, stating that the

"Company has not been provided with information as to the reason for the short pay." ROA.471(¶87).  They further claimed that the $8.8 million charge was taken "primarily because of the Company's inability to charge back the publishers for the short pay given the lack of information and related documentation supporting such transaction." *Id.*  This deceptive explanation appears designed to obscure the fraud: under Direct Digital's contracts, the publishers retain the ad payments whether or not the Company is paid by the DSPs.  ROA.458(¶50).

Direct Digital also filed its overdue Form 10–Qs, which showed Q1 2024 revenue of just $22.27 million and a $3.8 million net loss.  ROA.472(¶90).  For Q2 2024, it reported only $21.8 million in revenue and a $3.1 million net loss.  *Id.*  On this news, Direct Digital's stock price sank another 23% to close near its pre–Class Period trading level at $2.77 per share.  ROA.490(¶135); ROA.443(¶5).

## SUMMARY OF ARGUMENT[5]

The district court's dismissal order should be reversed.  Rather than analyzing the distinct categories of alleged misstatements, such as false statements of fact, misleading half–truths, and misleading opinions, the court treated them collectively and dismissed all claims in a single, largely undifferentiated ruling.  It concluded that the challenged statements were entirely accurate or merely "vague, optimistic generalizations" and that Defendants could not "be held responsible for failure to

---

[5] Unless otherwise noted, citations, internal quotation marks, and footnotes are omitted.

14

foresee future events." In doing so, the court disregarded controlling precedent from the Supreme Court and this Circuit and erroneously found that Plaintiff failed to allege any actionable misstatements or omissions.

*First*, the court erred in dismissing claims based on Defendants' March 26, 2024 statements of current fact, which attributed Direct Digital's $12.9 million FY 2023 revenue shortfall to "two primary factors" said to be transitory and confined to Q4 2023. That explanation was false. The actual primary cause—Google's undisclosed "short pay" exceeding $8.8 million along with lost revenues from its suspension of business—accounted for most, if not all, of the miss. Even if treated as a "half–truth," the statements are actionable under *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263–64 (2024) because Defendants omitted the most significant cause both quantitatively (over $8.8 million) and qualitatively (Google, an industry–leading DSP, was far and away Direct Digital's most important customer).

*Second*, the court erred in dismissing Walker's February 1, 2024 "half–truth" opinion in which he touted the "execut[ion] on our robust growth strategy" and the Company's "rapid growth" in opining that raising FY 2023 revenue guidance was a "significant milestone" for the Company. This conveyed to reasonable investors that Direct Digital's FY 2023 guidance was sound and that the Company's "rapid growth" trajectory remained intact. That opinion, however, was materially

misleading because it did not "fairly align[]" with "the information in the [Defendants'] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pen. Fund*, 575 U.S. 175, 189 (2015). Defendants already knew of the critical misdeclaration–related platform defect, The Trade Desk's partial blockage, Google's Q4 2023 suspension and pullback of business, and its more than $8.8 million short pay.

*Third*, the court erred in dismissing Defendants' May 10, 2024 statements of current fact which included that Direct Digital "remains profitable" and was "experiencing continued growth into 2024." Those statements were objectively false when made. With Q1 2024 complete and Direct Digital's Form 10–Q due within days, Defendants knew the Company had experienced a $3.8 million net loss in Q1 and quarterly revenues had plummeted from $41 million to $22.3 million. Such concrete financial related misstatements are plainly actionable because "[t]hey convey precise information on which investors are likely to rely when valuing corporations." *Six Flags*, 58 F.4th at 220.

*Fourth*, the court erred in dismissing Defendants' November 9, December 5, and January 9 guidance–related statements, in which they touted the Company's positioning for growth, and raised then repeatedly reaffirmed FY 2023 guidance without disclosing the already–materialized misdeclaration crisis, The Trade Desk's

16

partial blockage, and Google's Q4 2023 suspension. Having voluntarily spoken about Direct Digital's growth and outlook, Defendants were required to disclose "information indicating a significant risk" to Direct Digital's growth narrative and FY 2023 guidance. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).

*Fifth*, because the Complaint adequately pleads multiple primary violations, the court likewise erred in dismissing the derivative §20(a) control person claims.

*Finally*, the court abused its discretion in denying Plaintiff's request to file a limited sur–reply addressing new arguments and exhibits first raised in Defendants' reply brief. By considering those materials without permitting a response, the court violated the rule articulated in *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 296 (5th Cir. 2022).

For these reasons, the district court's dismissal order should be reversed and the case remanded for further proceedings.

**STANDARD OF REVIEW**

This Court "review[s] *de novo* a district court's dismissal for failure to state a claim under Rule 12(b)(6)," and motions to dismiss "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). The Court "accept[s] all factual allegations in the complaint as true," *id.*, and "construe[s] the allegations in the light most favorable to the plaintiffs." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).

17

This Court reviews the district court's failure to allow a sur–reply to address matters raised for the first time on reply under an abuse of discretion standard. *Residents of Gordon Plaza*, 25 F.4th at 296.

## ARGUMENT

**I.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S PRIMARY LIABILITY CLAIMS[6]**

**A.    The District Court Erred in Finding That Defendants' March 26, 2024 Statements of Current Fact Regarding the Two Primary Reasons for Direct Digital's FY 2023 Revenue Shortfall and Current Positioning for Future Growth Were Not Actionable**

Section 10(b) of the Exchange Act and Rule 10b–5 make it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b–5(b). This rule prohibits both outright "false statements or lies" and "half–truths." *Macquarie*, 601 U.S. at 263. "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192. "Put differently, [Rule 10b–5(b)] requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie*, 601 U.S. at 264.

---

[6] Plaintiff does not challenge the district court's ruling as it pertains to whether the allegedly misleading statements found in the following paragraphs of the Complaint are independently actionable: ROA.473–474(¶94); ROA.474–475(¶97); ROA.477(¶102); and ROA.478(¶105). Likewise, Plaintiff does not challenge the dismissal of his §10(b) claim against Smith.

On March 26, 2024, Direct Digital announced its deeply disappointing FY 2023 financial results, reporting $157.1 million in revenues, and badly missing its revenue guidance of $170 million to $190 million.  ROA.481(¶111).  On this news, Direct Digital's stock price plummeted nearly 40%.  ROA. 447(¶16).  Seeking to reassure investors, Defendants insisted that Direct Digital remained positioned "to continue our strong revenue growth and market share gains in 2024" because the miss had been caused by "two primary factors" largely confined to the just– completed Q4 2023, that is: (1) "lower–than–anticipated demand" and (2) its proactive, "accelerate[d] . . . transition towards a cookie–less advertising platform." ROA.482–483(¶¶112–114).  Plaintiff alleges that these statements are actionable false statements or half–truths.  ROA.481(¶111); ROA.482–483(¶¶113–115).[7]

The explanation that "lower demand" and a "cookie–less transition" were the "two primary factors" behind the shortfall was objectively false.  The actual, undisclosed "primary factor" behind the $12.9 million revenue shortfall was that Direct Digital's largest customer, Google, which accounted for 82% of total Company revenues, "short paid" a Q4 2023 invoice such that the associated revenue—which exceeded $8.8 million—could not be recognized.  ROA.470– 471(¶87).  This came on the heels of Google blocking Colossus SSP from its

---

[7] Referring to these statements, the district court held: "At least three of the statements state either a weaker demand for Direct Digital's services or a 'softening' of the market.  This, in fact, is precisely what the plaintiff alleges happened."  ROA.2040.  As explained below, the court never addressed the false "two primary factors" statement or the "half–truth" aspect of the claim.

platform in late Q4 2023 and issuing refunds to its advertisers due to Colossus SSP's

systematic misdeclaration of user IDs.   ROA.461(¶60);   ROA.465–466(¶¶71–75).

Plaintiff therefore adequately alleges that Google's more than $8.8 million short pay

(along with the financial consequences of its Q4 misdeclaration–related suspension[8])

was the actual primary driver of the $12.9 million revenue miss.[9]  ROA.481(¶111);

ROA.470–471(¶87).   These allegations are sufficient to allege an actionable false

statement. *Lormand*, 565 F.3d at 243 ("[a] reasonable person may draw the plausible

inferences from the foregoing allegations that the defendants made . . . material

misrepresentations and omissions").

Setting aside Defendants' false "two primary factors" framing, their repeated

explanations for the FY 2023 revenue shortfall also constitute actionable half–truths.

---

[8] The lost Google revenues from its Q4 2023 suspension and subsequent pullback are in addition to the more than $8.8 million short pay.  While not determinative, Plaintiff is entitled to the favorable inference that the financial ramifications of Google's Q4 2023 suspension and pullback were substantial.  *See Lormand*, 565 F.3d at 239 (for falsity, the court "must draw all reasonable inferences in the plaintiff's favor").  Even with the Q4 Google suspension, pullback, and short pay, Direct Digital still averaged more than $10 million in monthly Google revenues for Q4 2023. ROA.461(¶60) ($30.88 million in quarterly revenues).  In Q1 2024, the average was only $5 million.  *Id.* (Q1 Google revenues of $15.1 million).  Accordingly, an extremely conservative estimate is that, after its suspension, Google pulled back its business by at least half.  Even a very short–lived suspension beginning after Thanksgiving (ROA.466(¶75)), would have resulted in more than a $5 million negative Q4 impact (*i.e.*, half of the $10 million average) for the month of December.  The actual financial impact was certainly far greater.

[9] While also not dispositive, Plaintiff is entitled to the reasonable inference that the Google short pay was connected to the ongoing user ID issues.  *See Rougier v. Applied Optoelectronics, Inc.,* No. 4:17–CV–2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) ("Plaintiff's allegations create an inference that . . . AOI's declining committed orders from Amazon were caused by AOI's production and quality control problems"); *see also* ROA.465(¶71) ("Google reportedly issued credits to its affected advertisers after identifying the Colossus SSP mismatches.").

ROA.481(¶111); ROA.482–483(¶¶113–115).  As the U.S. Supreme Court explained in another §10(b) case, "[a] classic example of an actionable half–truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Macquarie*, 601 U.S. at 263–64; *see also Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. Ct. App. 1931) (Cardozo, C.J.) ("The buyer, warned of the risk, was ready to assume it.  But there was another and greater risk about which the seller was silent, a risk like in kind but vastly greater in degree.  Rutledge street, if opened, would split the plot in halves.").

Defendants told investors that Direct Digital's disastrous FY 2023 results stemmed from two temporary issues, largely confined to Q4 2023.  ROA.481(¶111); ROA.482–483(¶¶113–115).  In truth, the undisclosed "third road"—which in this case had already been built—was far more consequential.  Google's $8.8 million short pay (along with its suspension) accounted for most, if not all, of the $12.9 million FY 2023 revenue shortfall, and its business pullback continued to depress Direct Digital's revenues during the now nearly complete Q1 2024.  ROA.461(¶60); ROA.465–466(¶¶71–72); ROA.470–471(¶87); ROA.472(¶90).  Few if any facts could have been more material to investors.[10]  Having chosen to explain the

---

[10] In short, Direct Digital's largest customer—Google (ROA.466(¶75))—which generated 82% of the Company's revenues (ROA.461(¶60)) and was one of the world's most powerful DSPs (ROA.459(¶53))—suspended its relationship with the Company (ROA.466(¶¶72–73, 75)) after discovering that the Colossus SSP platform was misdeclaring user IDs and failing to deliver

purported principal factors accounting for the FY 2023 shortfall, Defendants' decision to "say[] one thing and hold[] back another" rendered their statements made actionable half–truths. *Omnicare*, 575 U.S. at 192.

As one industry commentator recognized even prior to Direct Digital's delayed disclosure of the Google short pay: "So, while Direct Digital Holdings tried to spin a tale of proactive adaptation to industry changes [on March 26, 2024], the reality was far grimmer. *The loss of trading privileges with major partners like The Trade Desk and Google likely had a direct impact on their bottom line. These events make a far more plausible explanation for their Q4 financial woes than the narrative they attempted to sell.*" ROA.470(¶86).

Defendants' assurances that Direct Digital remained positioned to "continue our strong revenue growth and market share gains in 2024" were likewise misleading. ROA.481(¶111); *see also* ROA.482(¶113) ("continue revenue growth and market share gains in 2024"). After Google's Q4 2023 suspension, it dramatically scaled back its business with Direct Digital. ROA.465–466(¶¶71–72); ROA.461(¶60). With just five days remaining in Q1 2024, Defendants could see that Google revenues (and total revenues) had continued to plunge in 2024.

---

targeted advertising to Google's clients (ROA.465(¶71)). Google then issued credits to its affected advertisers (ROA.465(¶71)), refused to pay more than $8.8 million for the deficient services (ROA.470–471(¶87)), and sharply curtailed its business with Direct Digital thereafter (ROA.465(¶71); ROA.461(¶60)). Such events cannot plausibly be dismissed as mere "day–to–day business difficulties," as the district court suggested. ROA.2040.

ROA.461(¶60) (showing Google revenues falling from $48.77 million in Q3 2023 to $30.88 million in Q4 2023 to $15.15 million in Q1 2024); ROA.481–482(¶112). Making matters worse, Colossus SSP's misdeclaration problems continued as Direct Digital's efforts to address the issue fell flat. ROA.466(¶73); ROA.463–464(¶67). Consequently, Defendants' optimistic statements regarding Direct Digital's then–current positioning for FY 2024 growth were materially misleading without disclosure of the persistent platform problems which already led to the Google suspension, short pay, and its pullback of business. *See Rougier*, 2019 WL 6111516, at *1, *9 (disclosure of decreasing orders required for customer responsible for 50% of revenues).

Plaintiff's allegations regarding the undisclosed facts are not improper "fraud–by–hindsight," as the district court seemed to suggest. *See* ROA.2041. Facts learned later can be used to show the then–current state of affairs at the time of the misleading statements. *See Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019) ("evidence of later events can provide useful circumstantial evidence that a given representation was false when made"); *accord Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). Even so, in the Fifth Circuit, "fraud–by–hindsight issues arise in the context of the scienter factor, not the misrepresentation factor." *Masel*, 924 F.3d at 750.

23

In summarily deeming Defendants' March 26, 2024 statements inactionable, the district court disregarded controlling authority and overlooked critical allegations. It failed to acknowledge that Google's Q4 2023 short pay (and lost Q4 revenues from Google's suspension) accounted for more than $8.8 million of the Company's $12.9 million FY 2023 revenue shortfall. ROA.2039–2041. Nor did the court consider the already materialized risks and future consequences of losing business from the world's most prominent DSP and Direct Digital's largest customer. *Id.* The absence of such analysis underscores the district court's oversight and the need for this Court to correct the error below.

**B.    The District Court Erred in Finding That Walker's February 1, 2024 "Half–Truth" Opinion That Raising Direct Digital's FY 2023 Guidance Was a "Significant Milestone" Was Not Actionable**

The U.S. Supreme Court has recognized that "half–truth" opinion statements are actionable under the federal securities laws. *Omnicare*, 575 U.S. at 193. To plead an actionable misleading opinion, a plaintiff must allege the opinion did not "fairly align[]" with "the information in the [defendants'] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect. *Id.* at 189.

On February 1, 2024, prior to Direct Digital releasing its FY 2023 financial results, the Pulse 2.0 website posted its interview with Walker in which he was asked to opine "what have been some of [Direct Digital's] most significant milestones." ROA.479–480(¶108). Walker began by boasting of Direct Digital's ongoing

24

"execut[ion] on our robust growth strategy," the Company's "rapid growth," and its "strong earnings results in recent quarters," and then responded that "[a] significant milestone for the team" was "importantly . . . in Q3 we raised our guidance again to a range of $170 million to $190 million for FY 2023." *Id*.; *see also* ROA.480(¶109) (the next day Direct Digital's LinkedIn page promoted the interview, provided a link, and thanked Pulse 2.0 for its post).

Plaintiff alleges Walker's statements conveyed to reasonable investors that Direct Digital's "milestone" FY 2023 guidance was sound, was not at considerable risk of being badly missed, and that the Company's much–touted "robust growth strategy" and "rapid growth" remained intact. ROA.480(¶110). This was the only reasonable takeaway given that FY 2023 had already closed a month earlier and Walker had previously reaffirmed that same guidance *after* year end. *See* ROA.479(¶106); *In re BP p.l.c. Sec. Litig.*, No. 4:10–MD–2185, 2016 WL 3090779, at *14 (S.D. Tex. May 31, 2016) ("[T]he context in which [Defendants'] statements were presented is critical to determining how a reasonable investor would have taken them."); *see also W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 655 (N.D. Ill. 2020) ("while the exact range of net sales was still being finalized" after quarter end, "reasonable investors could infer" defendant "had enough information" to support its optimistic statements).

25

Buoyed by the false belief that Direct Digital's impressive growth story remained intact, investors drove the Company's stock price to a Class Period high of $32.51 per share the following month, on March 15, 2024.  ROA.444(¶8).

Yet, it was misleading for Walker to trumpet Direct Digital's "rapid growth" and raising of FY 2023 guidance without qualification, and without disclosing facts seriously undermining any claim that FY 2023 guidance was a milestone, or at least a *positive* milestone as investors were led to believe.  ROA.480(¶110).  At minimum, the ongoing platform problems (which Direct Digital later admitted it could not fix), Google's Q4 2023 suspension and curtailment of business, and its short pay exceeding $8.8 million represented a significant and imminent material risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance.  *Id.*; ROA.466(¶73).

Once Walker "voluntarily chose to speak publicly" on the topics, he was "required to speak the full truth and accurately inform, rather than mislead."  *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010).  Because the omission of the Q4 2023 Google suspension, curtailment of its business, and $8.8 million short pay show that the purported opinion that Walker volunteered did not "fairly align[]" with "the information in the [his] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect, Plaintiff has adequately pleaded an actionable misleading statement.  *Omnicare*, 575 U.S. at 189.

26

**C.    The District Court Erred in Finding That Defendants' May 10, 2024 False and Misleading Statements of Current Fact Concerning the Company's Q1 2024 Performance Were Not Actionable**

On May 10, 2024, responding to the first public reports that Direct Digital was blocked by The Trade Desk and Google for systematically misdeclaring user IDs, Defendants denied the reports and then tried unsuccessfully to shift the blame. ROA.465(¶70); ROA.466(¶73).  After The Trade Desk and Google both confirmed the issue, Defendants changed tactics and tried to reassure investors that Direct Digital was not in any financial peril as a result.  ROA.464(¶68); ROA.466(¶72), ROA.466(¶73); ROA.484(¶¶118–119).  According to a *CampaignUS* article, Direct Digital released a statement claiming that "DDH" (*i.e.*, Direct Digital Holdings) "remains *operationally well–positioned and financially strong* with estimated 2023 FY earnings of $157 million *and is experiencing continued growth into 2024*." ROA.484(¶119); ROA.620.  The article further reported that, with "Direct Digital Holdings share price ha[ving] fallen 59% in the past month," "Walker denounced any suggestions that Colossus' ID mismatch was related to the holding company's financial situation," assuring investors the Company "*remains profitable*" and "its first–quarter performance was '*up 20% year over year*.'"    ROA.484(¶118); ROA.620.

This was untrue.  Direct Digital did not remain profitable.  ROA.485(¶120). For Q1 2024, which closed six weeks earlier and for which Direct Digital's Form

10–Q was due in less than a week, the Company experienced a significant quarterly net loss of $3.8 million, down from the $2.0 million net income for FY 2023 the Company had reported weeks earlier. *Id.* Rather than "20% year over year" growth or "continued growth into 2024," Direct Digital's revenues grew less than 5% year over year, with quarterly revenues dropping off a cliff, from $41 million in Q4 2023 to $22.3 million in Q1 2024. *Id.* As a result, Direct Digital was neither "operationally well–positioned" nor "financially strong." *Id.* It was not until October 15, 2024, when the Company filed its Q1 2024 Form 10–Q some five months later, that investors learned this truth. ROA.472(¶90); ROA.485(¶120).

In dismissing these claims, the district court failed to explain how concrete factual statements of this nature could properly be characterized as vague or merely optimistic generalizations on which no reasonable investor would rely. ROA.2039–2040. They are not. These misstatements are actionable because "[t]hey convey precise information on which investors are likely to rely when valuing corporations." *Six Flags*, 58 F.4th at 220.

> **D.  The District Court Erred in Holding That Defendants' Growth and Financial Guidance–Related Statements Were Not Actionable**
>
> **1.  Defendants' November 9, 2023 Statements Concerning Direct Digital's Increase of FY 2023 Guidance Were Materially Misleading Absent Disclosure of the Grave Risk That Google Would Discover Colossus SSP's Systematic Misdeclaration of User IDs**

On November 9, 2023, Direct Digital announced impressive financial results

and raised its FY 2023 revenue guidance by 50% to between $170 million and $190 million.  ROA.474(¶95).  Defendants explained that this exciting increase was driven by "the relationships that we've been able to build and the platform that we've been able to establish" (ROA.476(¶100)), as well as Direct Digital's operational/platform strength and excellence (ROA.474(¶95); ROA.475–476(¶¶99–100)).[11]

Defendants' statements, however, left out critical facts concerning existing risks which threatened both the Company's FY 2023 revenue outlook and its future viability.  ROA.474(¶96).  In truth, the Company's Q3 2023 success and FY 2023 outlook was built on a precarious foundation—one that Defendants knew was at serious risk of collapsing.  *Id.*  At the time, Direct Digital was experiencing a significant crisis with Colossus SSP's platform.  *Id.*  The Company's second largest customer, industry behemoth The Trade Desk, had in mid–2023 observed Colossus SSP systematically presenting misdeclared user IDs and partially blocked the SSP across its platform.  ROA.459(¶53); ROA.464(¶68).  Direct Digital was able to offset its continuing loss of The Trade Desk business by relying on its largest customer, Google.  ROA.461(¶60); ROA.466(¶75).  But this near–total reliance on Google came with an additional risk.  Like The Trade Desk, Google was one of the world's most sophisticated DSPs.  ROA.459(¶53).  When Google learned that Colossus's

---

[11] The conference call statements at issue were made on November 9, 2023, rather than November 11, 2023, as erroneously stated in the Complaint.  ROA.475–476(¶¶99–100); ROA.724.

platform was misdeclaring user IDs thereby cheating its advertisers, the repercussions would be swift and devastating. ROA.476–477(¶101).

Having chosen to raise revenue guidance by 50% based in part upon the strength of Direct Digital's platform and its customer relationships, Defendants had a duty to disclose the known "significant and material risk" to its business which concerned both. *See* ROA.476–477(¶101); *Matrixx*, 563 U.S. at 47 (disclosure required where "information indicat[ed] a significant risk to its leading revenue–generating product"). Indeed, Defendants had repeatedly acknowledged that controlling invalid traffic—which includes such "[f]alsely represented inventory"—was essential to "protecting the Company's growth" by "build[ing] trust in the market with the buying community." ROA.460(¶¶55–57); *see also* ROA.459(¶52) ("Colossus Media's partnerships with the most prominent DSPs [we]re of critical importance, as these relationships dr[ove] a substantial portion of its impressions and revenue.").

Regardless of whether Direct Digital's financial guidance was achievable when first issued, Defendants concealed the extent of the risk the Company faced from the ongoing misdeclaration problems. Their failure to disclose those known and severe risks rendered their statements materially misleading. *See Lormand*, 565 F.3d at 249 (statements actionable where defendants "omitted known risks of severe magnitude"); *Roofers Local No. 149 Pension Fund v. Amgen Inc.*, No. 23 Civ. 2138

(JPC), 2024 WL 4354809, at *12 (S.D.N.Y. Sept. 30, 2024) (despite describing potential IRS liability as "substantial," disclosure of the actual amount of financial exposure was needed to be clear and complete).

> **2. Defendants' December 5, 2023 and January 9, 2024 Voluntary Reaffirmations of FY 2023 Guidance Were Materially Misleading Because They Omitted That the Misdeclaration Risk Had Materialized and Google Had Suspended Its Business**

The known but undisclosed risk that, like The Trade Desk, Google would soon identify Colossus SSP's misdeclaration defect materialized in late 2023. ROA.466(¶¶72, 75). Google discovered the Company's systematic misdeclaration of user IDs and "took prompt action" to suspend Colossus SSP from its platform. ROA.466(¶72). Although Google would eventually reinstate Colossus SSP, it did so at sharply reduced volumes. ROA.445(¶11); ROA.465(¶71).

Following Google's suspension and pullback of its business, Defendants could have chosen to remain silent regarding Direct Digital's positioning for growth and financial outlook. *See Matrixx*, 563 U.S. at 45 ("companies can control what they have to disclose under [the securities laws] by controlling what they say to the market"). Having instead "voluntarily chose[n] to speak publicly" about the Company's business and guidance, "they were required to speak the full truth and accurately inform, rather than mislead." *ArthroCare,* 726 F. Supp. 2d at 716.

31

On December 5, 2023, Walker presented at the Noble Capital Markets conference in Boca Raton. ROA.477(¶102). With just over three weeks remaining in the year, he reaffirmed FY 2023 guidance, stating "we were able to raise guidance to about 170 to 190 million of top line revenue and we expect for us to be within that range." ROA.477–478(¶103); ROA.574. On January 9, 2024, with FY 2023 now complete, Walker chose to speak to the ICR Conference at the Grande Lakes Resort in Orlando and again voluntarily reaffirmed that same FY 2023 revenue guidance of $170 million to $190 million, declaring "we've been able to grow and I think the market has finally started catching up with our story." ROA.479(¶106).

These statements were materially misleading when made. Walker's touting of FY 2023 growth and guidance omitted "critical qualifying information." *Macquarie*, 601 U.S. at 258. He failed to disclose the known, serious and continuing platform defects, and the recent blockages and suspensions by Direct Digital's two largest customers, Google (accounting for 82% of revenues) and The Trade Desk. ROA.478(¶104); ROA.479(¶107); ROA.461(¶60). Nor did he warn that the resulting operational and financial impacts were already being felt. *Id.*; *see Omnicare*, 575 U.S. at 189 (opinion statement actionable if it did not "fairly align[]" with "the information in the [Defendants'] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect).

32

Walker's omission of these then–existing facts and associated risks rendered his positive growth and guidance statements materially misleading.  *See Lormand,* 565 F.3d at 249 (omission actionable where "defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized"); *Rougier*, 2019 WL 6111516, at *10 (the "Complaint alleges that Amazon's drop in demand was caused by [defendant's] manufacturing problems, although Defendants omitted these facts from investors.  [It] therefore shows that Defendants either did not actually hold the opinion . . . stated or that Defendants omitted material facts that conflicted with what a reasonable investor would take from the statement itself."); *Hutchins v. NBTY, Inc.*, No. CV 10–2159(LDW)(WDW), 2012 WL 1078823, at *5–*6 (E.D.N.Y. Mar. 30, 2012) (omission that company's "biggest wholesale customer[] was soliciting competitive bids" rendered positive statements regarding future performance misleading).  Such omissions of present fact are actionable even if FY 2023 guidance was still theoretically attainable.  *See Six Flags,* 58 F.4th at 214 (plaintiff provided "factual allegations about inadequate construction to explain why a reassurance like 'our parks are progressing nicely towards their anticipated opening dates' is misleading, even if still theoretically possible (though highly unlikely)").

33

The Supreme Court's reasoning in *Matrixx* confirms the point. There, the defendants projected revenue growth of 50% and later 80% for Zicam[12]—Matrixx's cold–remedy product that accounted for 70% of company sales—while failing to disclose evidence linking the product to a loss of smell. 563 U.S. at 33–34, 45–47. The Court held that such positive guidance was materially misleading because the company "had information indicating a significant risk to its leading revenue–generating product." *Id.* at 47. Here, the parallel is even stronger: the risk to Direct Digital's leading revenue source—Google, responsible for 82% of revenues—had materialized and was already inflicting financial harm. As in *Matrixx*, Defendants told the market that revenues "were going to rise [significantly]," even though they possessed information revealing a "significant risk to [their] leading revenue–generating [customer]." *Id.* at 47; *see Lormand*, 565 F.3d at 249 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)) (defendants "must disclose material, firm–specific adverse facts that affect the validity or plausibility of [a] prediction").

Accordingly, Plaintiff has adequately alleged that Walker's growth and guidance–related statements were materially misleading when made. *See*

---

[12] Specifically, the company claimed that Zicam was "'poised for growth in the upcoming cough and cold season'" and that the company had "'very strong momentum.'" *Matrixx*, 563 U.S. at 33. It further said that it expected revenues to be "'be up in excess of 50% and that earnings, per share for the full year [would] be in the 25 to 30 cent range.'" *Id.* "In January 2004, Matrixx raised its revenue guidance, predicting an increase in revenues of 80 percent and earnings per share in the 33–to–38–cent range." *Id.* at 33–34.

*Macquarie*, 601 U.S. at 264 (defendants must reveal "information necessary to ensure that statements already made are clear and complete").

## II. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S CONTROL PERSON CLAIMS

Because Plaintiff's §20(a) control person claims are derivative of his §10(b) claims, the district court dismissed them together. ROA.2041. Accordingly, if this Court reverses the dismissal of Plaintiff's §10(b) claims, it should likewise reverse the dismissal of his §20(a) claims. *Six Flags*, 58 F.4th at 221.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S REQUEST FOR A SUR–REPLY

"[A] district court abuses its discretion when it considers new arguments raised for the first time in a reply brief without providing the non–movant an adequate opportunity to respond prior to a ruling." *Residents of Gordon Plaza*, 25 F.4th at 296.

Defendants' reply brief opened by asserting that the Complaint's allegations "have only grown more dubious in recent months." ROA.1924. To support that improper argument, Defendants cited and attached (1) an opinion from their own Maryland litigation, *Colossus Media, LLC v. Adalytics Research, LLC*, No. DKC 24–1402, 2025 WL 712986, at *6–*11 (D. Md. Mar. 5, 2025) (ROA.1924; ROA.1981–1990), and (2) a ten–page Media Rating Council ("MRC") statement. ROA.1924; ROA.1945–1954.

35

Plaintiff promptly sought leave to file a concise, two–page sur–reply explaining why these arguments and materials were irrelevant and improper on a Rule 12(b)(6) motion.  ROA.1991–1993.  Plaintiff explained that the Maryland *defamation* lawsuit, unlike this action, is premised upon allegations that Adalytics suggested Colossus *intentionally* misdeclared user IDs to *fraudulently* sell ads at inflated prices.  ROA.1998–1999.  Drawing all reasonable factual inferences in Colossus's favor on a motion to dismiss, that court upheld the complaint, but it never addressed whether Colossus systematically misdeclared user IDs in the first instance.  ROA.1999.  Plaintiff further showed that the April 11, 2025 MRC statement was unrelated to Adalytics' May 2024 report, did not concern Colossus SSP's misdeclaration of user IDs, and was not properly before the court.  *Id.*

Although the district court initially granted leave to file the sur–reply (ROA.2003), it later reversed itself, reasoning that "the additional briefing does not introduce new evidence or developments in the law since the initial briefing." ROA.2035.  That rationale misconstrued Plaintiff's request.  The sur–reply sought not to introduce new evidence, but to rebut the new arguments and exhibits Defendants improperly injected—prominently on the first page of their reply—to undermine Plaintiff's core allegations.  ROA.1924; ROA.1993.

Because the district court considered those materials and arguments in concluding that Colossus SSP's platform crisis amounted merely to "day–to–day

business difficulties," ROA.2040, yet denied Plaintiff any opportunity to respond, it abused its discretion. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.,* 99 F.4th 770, 774 (5th Cir. 2024) ("when a party raises new arguments or evidence for the first time in a reply, the district court must either give the other party an opportunity to respond or decline to rely on the new arguments and evidence").

## CONCLUSION

The dismissal of the Complaint should be reversed and this action remanded for further proceedings.

DATED:  November 17, 2025        JOHNSON FISTEL, PLLP


                                 *s/ Michael I. Fistel, Jr.*
                                 MICHAEL I. FISTEL, JR.
                                 40 Powder Springs Street
                                 Marietta, GA  30064
                                 Telephone: 470.632.6000
                                 michaelf@johnsonfistel.com

                                 JOHNSON FISTEL, PLLP
                                 JEFFREY A. BERENS
                                 2373 Central Park Boulevard, Ste. 100
                                 Denver, CO  80238
                                 Telephone: 303.861.1764
                                 jeffb@johnsonfistel.com

SPONSEL MILLER PLLC
THANE TYLER SPONSEL III
520 Post Oak Boulevard, Ste. 310
Houston, TX  77027
Telephone: 713.892.5400
sponsel@smglawgroup.com

*Counsel for Plaintiff–Appellant*

## **CERTIFICATE OF SERVICE**

I am employed in the County of Cobb.  I am over the age of eighteen years and am not a party to the within entitled action.  My business address is 40 Powder Springs Street, Marietta, Georgia 30062.

This is to certify that the foregoing document has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on November 3, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2025 at Marietta, Georgia.

*s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.

## <u>CERTIFICATE OF COMPLIANCE WITH <u>FED. R. APP. P. 32(a)</u></u>

This brief complies with the type–volume limitations of <u>Fed. R. App. P. 32(a)(7)(B)</u> because it contains 8,646 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u> and <u>5th CIR. R. 32.1</u>, as calculated by the word–counting feature of Microsoft Office 2020.

This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u>, and <u>5th CIR. R. 32.1</u> and the type–style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14–point Times New Roman.

*s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.

*Counsel for Plaintiff–Appellant*
